**25-1058**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

◆◆◆

SENTIENT SENSORS LLC,

*Appellant,*

—v.—

XILINX, INC., ADVANCED MICRO DEVICES, INC., ATI TECHNOLOGIES ULC,

*Appellees.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
PATENT TRIAL AND APPEAL BOARD, IN NO. IPR2023-00195

## REPLY BRIEF FOR APPELLANT

ANDREW COCHRAN
GERALD J. FLATTMANN, JR.
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000

*Attorneys for Appellant*

## **TABLE OF CONTENTS**

**I. INTRODUCTION** ...................................................................................1

**II. ARGUMENT** .......................................................................................2

    **A. Xilinx's Argument Regarding the Appropriate Legal Analysis is Misplaced.** ...........................................................................................2

        **1. Sentient Never Argued Lexicography or Disavowal.** ............................2

        **2. Xilinx's Portrayal of this Claim Construction Issue as a Fact Dispute is Incorrect.** .............................................................................6

        **3. Sentient Was Always Consistent and Has Never Abandoned Arguments on Claim Construction.** ....................................................8

        **4. The Intrinsic Evidence is Not Attorney Argument.** ...........................11

    **B. Xilinx Misinterprets the Record** ..................................................12

        **1. Xilinx's Interpretation of Fig. 2 of the '177 Patent is Inaccurate.** .........................................................................................12

        **2. Xilinx Misinterprets the Prosecution History.** ...............................18

        **3. Lyke Does Not Anticipate the Challenged Claims, and Xilinx Never Argued that it Does.** .......................................................21

    **C. Neither Lyke Nor Dehkordi Teach "Independent Processes."** ...............22

    **D. Power Converter** ...........................................................................24

        **1. Xilinx's Combined System of Lyke and Steele Fails to Establish the Contested "Power Converter"** ...............................24

**III.    RELIEF SOUGHT** ........................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. MPH Techs. Oy*, No. 2021-1355,
2022 WL 4103286 (Fed. Cir. Sept. 8, 2022) .......................................................23

*Connell v. Sears, Roebuck & Co.*,
722 F.2d 1542 (Fed. Cir. 1983) .........................................................................22

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ...........................................................................8

*Inline Plastics Corp. v. Lacerta Grp., LLC*,
97 F.4th 889 (Fed. Cir. 2024) ..........................................................................7, 8

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*,
790 F.3d 1298 (Fed. Cir. 2015) .........................................................................11

*Netflix, Inc. v. DivX, LLC*,
84 F.4th 1371 (Fed. Cir. 2023) ........................................... 22, 23, 26, 28

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co. Ltd.*,
521 F.3d 1351 (Fed. Cir. 2008) .........................................................................11

*Paice LLC v. Ford Motor Co.*,
881 F.3d 894 (Fed. Cir. 2018) .............................................................................7

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........................................... 3, 4, 5, 6

*Polygroup Ltd. MCO v. Willis Elec. Co., Ltd.*,
758 F. App'x 943 (Fed. Cir. 2019) .......................................................................7

*Rothe Dev. Corp. v. Dep't of Def.*,
545 F.3d 1023 (Fed. Cir. 2008) .........................................................................29

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
8 F.4th 1285 (Fed. Cir. 2021) ...........................................................................12

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) .........................................................................27

i

*Teva Pharms. USA v. Sandoz, Inc.*,
  574 U.S. 318 (2015) ...................................................................................6

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ...............................................................17

**Rules**

Federal Rule of Evidence 201(b)(2) .........................................................27

## I.    INTRODUCTION[1]

Mr. Blemel's innovative instrument controller is a multi-purpose system capable of processing and switching between both analog and digital signals simultaneously via numerous distinct field programmable gate array configurations. Each gate array configuration is distinct from the numerous other gate array configurations, and each runs independent of the others and the processor. This is what is described in the specification and the prosecution history, and this is what is reflected in the claims of the '177 patent, which require a FPGA configured to run independent processes in parallel with the processor.

When read in context with the intrinsic record, the construction of "independent processes" cannot be "separate processes" as proposed by Xilinx and adopted by the Board. By replacing "independent" with "separate" the Board improperly redrafted the claims and allowed Xilinx to remove a core inventive concept, broaden the scope of the claims, and read the prior art onto the invention. Under the proper construction, such as the one proposed by Sentient, the prior art fails to teach the claimed "independent processes" limitation because it fails to account for the simultaneous and independent nature of the various analog and digital processes discussed in the specification.

---

[1]    Unless otherwise noted, all emphasis is added and all internal citations and quotations are omitted.

Xilinx's Responsive Brief confuses these issues by focusing solely on extrinsic evidence and expert testimony. Xilinx also ignores the teachings of the intrinsic record as a whole and misinterprets two portions of that record by isolating and misreading them. Xilinx also attempts to protect the Board's erroneous decision by presenting a legal analysis contrary to this Court's decades-old law. The proper analysis under the established claim construction precedent focuses on the intrinsic record first before resorting to evidence outside the scope of the patent. Here, that intrinsic record supports Sentient's proposed construction and requires reversing the Board's adoption of Xilinx's construction.

For the "power converter" limitation, Xilinx misapplies the Steele reference and ignores a basic law of physics. Further, Xilinx's presentation of "multiple routes to affirmance" raises positions not presented in the IPR below. That issue, too, should be reversed because Steele fails to teach or suggest the limitation as claimed and described in the specification.

## II. ARGUMENT

### A. Xilinx's Argument Regarding the Appropriate Legal Analysis is Misplaced.

#### 1. Sentient Never Argued Lexicography or Disavowal.

Xilinx argues that Sentient's legal analysis is "wrong" and "fundamentally inconsistent with the framework from *Teva* and this Court." (Resp. Br. at 38.) That is incorrect. The appropriate analysis is: what is the plain meaning of the FPGA's

2

"independent processes" as recited in the claims to a person of ordinary skill in the art at the time of the invention in the context of the patent as a whole, including the claims, the specification, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-17 (Fed. Cir. 2005). The construction of a claim term may depart from that plain and ordinary meaning only if the intrinsic evidence reveals a "special definition given to a claim term by the patentee" or if there is "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id*. at 1316. Sentient never alleged lexicography or disavowal, and neither forms the basis for why the Board's decision should be reversed.

Instead, the intrinsic evidence reveals that the Board's adoption of Xilinx's proposed construction is divorced from how a person of ordinary skill in the art would understand the term "independent" because "separate" fails to account for the ways in which the specification describes how the various analog and digital processes in the FPGA are independent from each other and from those occurring in the processor, and because "separate" does not reflect the teachings of the specification or the goals of the invention. (*See* Op. Br. at 21-32.)

Rather than reconcile its proposed construction with the intrinsic record, Xilinx and the Board relied almost exclusively on extrinsic evidence, including the testimony of Xilinx's expert, Dr. Shanfield. (Resp. Br. 33-34 (citing Appx2289-2291; Appx2294-2295; Appx2297-2298).) Xilinx then doubled down on that

3

extrinsic evidence in its Responsive Brief by attempting to portray it as the only evidence that is legally relevant and subject to deferential review. (Resp. Br. at 16-17, 20, 34.) But that is not an appropriate view of the law under *Phillips* because it does not adequately account for the intrinsic evidence, including the specification as "the single best guide to the meaning of a disputed term" and "usually … dispositive." *Phillips*, 415 F.3d at 1315.

According to Xilinx and the Board, the cited extrinsic evidence is "'consistent' with the intrinsic record." (Resp. Br. at 2, 4, 6, 21, 23, 35.) The intrinsic evidence that Xilinx relies on to support its position is the examiner's rejection using Cloutier (Appx1766) during prosecution of the '177 patent (Appx2289-2291) and the patent's Fig. 2 and its description (Appx2294-2295; Appx2297-2298). As discussed below, however, Xilinx misreads these two portions of the record.

Though seemingly relying on intrinsic evidence, neither Dr. Shanfield nor Xilinx explain how that evidence supports the Board's conclusion that "independent" should be replaced with "separate." Instead, each relies on conclusory "i.e." statements and attorney argument to make their point: "The specification describes these 'independent processes' A1-A3' as 'independent configurations of a subset of gates within the FPGA,' *i.e., they are simply processes that run separately from each other*." (Resp. Br. at 6 (emphasis added).) Dr.

4

Shanfield made similar conclusory statements in his declarations without further explanation. (Appx2299 ("an FPGA is useful to run independent processes (*i.e., processes that are separate from each other*)"); Appx2298 (indicating Fig. 2 depicts "three processes that are running *separately—of [sic] independently—from another* on the FPGA"); Appx578 ("the FPGA is configured with a program that would run independently in parallel with the processor (*i.e., a separate program for the FPGA as opposed to the processor*)").) The Board then accepted these conclusory statements wholesale. (Appx21-22.)

This, too, is at odds with this Court's holding in *Phillips* because "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful" during claim construction. *Phillips*, 415 F.3d at 1318. Additionally, not only is extrinsic evidence "less significant than the intrinsic record," *Phillips*, 415 F.3d at 1317, but Xilinx uses that evidence to support a conclusion that "independent" should instead be "separate," which is "clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history," *id*. at 1318-19.

For these reasons, Xilinx's proposed construction of "independent processes" that was accepted by the Board is inconsistent with both the intrinsic evidence and this Court's holding in *Phillips*. As such, the Board decision should be reversed.

5

### 2. Xilinx's Portrayal of this Claim Construction Issue as a Fact Dispute is Incorrect.

Xilinx also overreaches with its reliance on the Supreme Court's decision in *Teva* to skew this issue as one requiring a "deferential 'substantial evidence' review." (Resp. Br. at 34, 38 (citing *Teva Pharms. USA v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015)).) That is, Xilinx's extrinsic evidence and expert testimony is inconsistent with, and not supported by, the intrinsic evidence. As mentioned, Xilinx and the Board point to only two portions of the intrinsic record that it alleges are consistent with Dr. Shanfield's testimony and other extrinsic evidence: (1) Fig. 2 and its description; and (2) the examiner's rejection using Cloutier during prosecution. (Resp. Br. at 2, 4, 6, 21, 23, 35.)

But, as explained *infra* (Section II.B.1), Xilinx's portrayal of Fig. 2 and the prosecution history is inaccurate, and the extrinsic evidence exacerbates that inaccuracy because it is cited only to advance Xilinx's litigation-driven position. *Phillips*, 415 F.3d at 1318 ("[E]xtrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence."); *see also Polygroup Ltd. MCO v. Willis Elec. Co., Ltd.*, 758 F. App'x 943, 949 (Fed. Cir. 2019) ("[The expert's] statement is a conclusory and unsupported assertion, and we find it to be inconsistent with the intrinsic record. So, his testimony does not provide substantial evidentiary support for the Board's conclusion").

6

Xilinx's reliance in its Responsive Brief on *Paice*, *Inline Plastics*, and *Hill-Rom* does not change the analysis. (Resp. Br. at 38, n.6.) In *Paice*, this Court upheld the Board's claim construction based on intrinsic evidence in the parent patent and prosecution history. *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 903 (Fed. Cir. 2018).

Xilinx cites *Inline Plastics* for the proposition that there is "no error where constructions 'fit the claim terms' ordinary meanings, and they align with the specification," which is exactly what Sentient argues to support its proposed construction. *Inline Plastics Corp. v. Lacerta Grp., LLC*, 97 F.4th 889, 901 (Fed. Cir. 2024). And instead of the "deferential 'substantial evidence' review" requested by Xilinx, *Inline Plastics* states that this Court should "decide the proper claim construction and address the intrinsic-evidence aspects of a claim-construction analysis de novo." *Id*.

*Hill-Rom* was cited by Xilinx to argue that a construction should "depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). As already mentioned, however, Sentient never alleged lexicography or disavowal. Nor did Xilinx. Thus, plain meaning based on the intrinsic record should apply.

The proper legal analysis here should be based on the intrinsic evidence under a de novo review. Under that analysis, the Board's conclusion that "independent processes" should instead be "separate processes" based on extrinsic evidence should be reversed in favor of Sentient's construction because Sentient's construction is more aligned with the specification, the claim language itself, and the goals of the invention. Xilinx's attempt to force a contrary legal analysis that ignores the intrinsic evidence and is based solely on a "deferential 'substantial evidence' review" of extrinsic evidence should be rejected.

### 3.    Sentient Was Always Consistent and Has Never Abandoned Arguments on Claim Construction.

Xilinx's attack on Sentient's claim construction position as inconsistently presented (Resp. Br. at 3, 13), with certain aspects of it "abandoned" along the way (Resp. Br. at 15, n.3, 25), is also incorrect.

As Xilinx points out, Sentient argued in district court litigation—as it does here—that the "independent processes" should be accorded its plain and ordinary meaning. (Resp. Br. at 33.) In fact, this was the meaning agreed upon by both Xilinx and Sentient in that litigation. (Appx2765.) Before that agreement was reached, however, Sentient argued—as it does here—that a person of ordinary skill in the art would understand the plain meaning of "independent processes" in the context of the specification to be "configured to run without computational assistance from the processor (in parallel)." (Appx2759.)

8

In its Patent Owner Preliminary Response below, Sentient did not present a construction of any term, but noted—as it does here—that claims should be given their ordinary and customary meaning in view of the specification under *Phillips*. (Appx212.)  The Board then asked for clarification of the parties' position on the plain and ordinary meaning of "independent processes" in its Institution Decision (Appx250-253), and Sentient presented its position on that meaning in its Patent Owner Response (Appx318; Appx320).  As mentioned in Sentient's Opening Brief, this construction was not meant to broaden or narrow the term, but to clarify what the claim already says, consistent with the intrinsic record when viewed by a person of ordinary skill in the art at the time of the invention.  (Op. Br. at 29.)  Thus, Sentient has been consistent in its arguments regarding the plain meaning of "independent processes."

Xilinx's attempt to muddle Sentient's consistent assertion of plain meaning with arguments regarding "clocks" and "control" should be rejected.  (*See* Resp. Br. at 13, 15, n.3, 25.)  Contrary to Xilinx's arguments, Sentient's construction does not implicitly require particular clocks or control.  (Resp. Br. at 3, 13, 15, n.3, 25.)  In fact, as Sentient argued in the IPR below, Sentient's proposed construction is agnostic to the presence or type of clock.  (Appx409.)  This too finds support in the specification and claims.  (Appx96(4:49-52); *see also* Appx97(6:65-7:35)(providing a further description of the various clocks that may be used).)

Instead, Xilinx's "clock and control" arguments appear to take issue more with the *application* of Sentient's construction rather than the *construction* itself. That is, when seeking to determine if the art teaches the claimed FPGA "configured to run *independent processes in parallel* with the processor," one must look to how each component of the prior art interacts. For example, if a processor provides the clock by which an FPGA operates, then it is the processor that is always in control, and the FPGA could not run independent processes in parallel with the processor as claimed in the '177 patent. (Appx301, Appx306, Appx325, Appx330, Appx341, Appx344.) Finding otherwise would contradict the plain meaning of "independent," which is what the Board did by replacing "independent" with "separate."

Rather than seeking to implicitly add limitations to the claims, Sentient's proposed construction simply seeks to give meaning to "independent" as that term is used in the claims and as viewed through the intrinsic evidence as a whole. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co. Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."); *accord Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1304-05 (Fed. Cir. 2015) ("Although the specification does not specifically define the term 'sealed,' the appropriate definition can be ascertained from the

10

specification"). Xilinx's misplaced argument that Sentient seeks to add implicit limitations to the claims is just a reflection of the fact that Xilinx's prior art fails to teach or suggest "independent processes" when it is properly construed.

### 4.      The Intrinsic Evidence is Not Attorney Argument.

Lastly, Sentient's reliance on the intrinsic record is not, as Xilinx contends, "irrelevant" or "attorney argument." (Resp. Br. at 40-41.) Nor is it waived. (Resp. Br. at 40 (alleging that an argument "was never made to the Board").) Instead, the intrinsic record as it relates to claim construction remains relevant even on appeal. *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1289 (Fed. Cir. 2021) ("The doctrine of waiver does not preclude a party from supporting its original claim construction with new citations to intrinsic evidence of record."). In any event, Sentient's proposed construction for "independent processes" has been consistent since it was proposed in the district court litigation. When prompted by the Board for further clarification of the plain meaning (Appx253-256), Sentient proposed a construction that was aligned with and supported by the intrinsic record. *Seabed*, 8 F.4th at 1290 ("given the clarity of the intrinsic evidence, resort to extrinsic evidence is unnecessary" and "the Board['s] reli[ance] on extrinsic evidence to alter the meaning of [the term] that is clear from the intrinsic evidence [] was error."). Xilinx's argument regarding "attorney argument" should be rejected.

11

**B.    Xilinx Misinterprets the Record**

As mentioned, Xilinx relies on two portions of the intrinsic record that it argues are consistent with construing "independent" as "separate:" (1) Fig. 2 and its description; and (2) the examiner's rejection using Cloutier during prosecution. (Resp. Br. at 35-37.)  Xilinx misinterprets both.

### 1.    Xilinx's Interpretation of Fig. 2 of the '177 Patent is Inaccurate.

According to Xilinx, like the Board below, Fig. 2 of the '177 patent supports its position that "independent" should be rewritten as "separate."  But Xilinx's portrayal of Fig. 2 in its Responsive Brief (*see* Resp. Br. at 5, 35) is inaccurate because it fails to take into account the full description of Fig. 2, the overall scope of the specification and claims, and the stated goals of the overall invention.  After isolating the description of Fig. 2 from the rest of the specification, Xilinx contradicts the concept of "independent" by arguing that the claim term means "separate processes" that are "tied to each other." (Resp. Br. at 35.)  Viewed through the correct lens, Xilinx's attempt to replace "independent" with "separate" is unworkable and excludes preferred embodiments of the invention.  The Board's adoption of Xilinx's position is thus reversible error.

Xilinx misinterprets Fig. 2 in its Responsive Brief, as it did in the IPR below. Namely, Xilinx argues: "[t]he specification describes these 'independent processes A1-A3' as 'independent configurations of a subset of gates within the FPGA,' *i.e.,*

*they are simply processes that run separately from each other*." (Resp. Br. at 5-6.) This is a non-sequitur, inconsistent with the specification, and provides no support for Xilinx's argument—adopted by the Board (Appx21)—that "independent" should be construed as "separate." Indeed, Xilinx later admits that the "independent processes" described in Fig. 2 "are ***tied to each other*** but are performed separately." (Resp. Br. at 35 ("Again, Dr. Shanfield explained how Figure 2 refers to three subsets of FPGA gates performing what the patent explicitly calls 'independent processes'—***which are tied to each other*** but are performed separately")).) But separate processes that are tied to each other cannot be interpreted as "independent processes" as that term is used in the claims and specification of the '177 patent because that would contradict any concept of independence that exists in the intrinsic record.

To clarify, the specification describes Fig. 2 as depicting an exemplary set of three gates (X1, X2, and X3) as switches—out of an exemplary total of 30,000 gates (Appx98(7:41-45))—that "are configured to route the input at node A to anyone [sic] of three independent processes, A1-A3." (Appx98(8:20-24).) These "three independent processes, A1-A3" in the center of Fig. 2 are "independent configurations of ***a subset of gates*** within the FPGA." (*Id.*)

The processes in Fig. 2 are depicted as "analog functions" of an "analog signal being monitored." (Appx93(Fig. 2)(referring to "FPGA Gates as Analog

13

Processes"); Appx98(8:26-32)(discussing "analog functions," "the signal monitoring function," and "the analog signal being monitored").) The output of these functions is routed to output node B via another set of three gates, *i.e.*, "[s]witches Y1, Y2 and Y3." (Appx98(8:24-26).) Depending on "the analog signal being monitored," the processes A1-A3 may be identical, which "form[s] a functional redundancy" that "increase[s] fault tolerance," or they may be different, in which case "different analog processing functions are selectively applied." (Appx98(8:26-32).)

In the context of the specification, Fig. 2 represents *a single subset of gates* within the FPGA configured to monitor and process input from one analog signal being monitored to produce an output. But the specification of the '177 patent as a whole contemplates "*numerous gate array patterns*" (Appx98(8:35-36)) like the one illustrated in Fig. 2, which act as "*multiple processors* formed in the FPGA for parallel processing" (Appx98(7:64-66)). This helps achieve the overall goal of the invention, which was "designed especially for managing multiple sensors" and for processing "multiple analog signals simultaneously." (Appx98(7:64-66), Appx99(9:18-23).)

Indeed, the simultaneous management and processing of multiple analog signals is not the only function that the described and claimed FPGA is designed to perform. As stated in the specification, "the FPGA can be programmed to monitor

14

the functionality of the microprocessor, the ***analog***-to-digital conversion operations, and the ***digital***-to-analog conversion operations." (Appx98(7:59-62).) Further, the specification states that "the FPGA could be performing signal processing while acting as a cross-bar switching device to select analog ***or*** digital signals, and performing signal conditioning and filtering at the same time." (Appx96(4:44-48); *see also* Appx93(Fig. 2)(depicting the described "cross-bar switching" via the grids at the top left and right).) Additionally, the specification explains that "[t]he inclusion of the FPGA in the design of the present invention provides a simultaneous parallel processing capability that can be implemented as a mathematical coprocessor and still perform as a digital processor (DSP) of multiple analog signals simultaneously digit[ized][2] by the ADC, all the while switching input lines to the ADC." (Appx99(9:18-23).)

Thus, the specification unambiguously describes the FPGA as capable of processing and switching between ***both*** analog ***and*** digital signals to produce outputs via numerous distinct gate array configurations that each act as an ***independent processor*** of distinct signals. These are distinct processes occurring within the FPGA that are independent of each other and occurring simultaneously. Xilinx's focus on Fig. 2's description ***in isolation*** to interpret "independent processes" as

---

[2]    The Certificate of Correction for the '177 patent corrected "digital" to "digitized." (Appx102.)

"separate processes"—indeed, "separate processes" that are "tied to each other" (Resp. Br. at 35)—entirely ignores these concepts from the intrinsic record.

Xilinx's arguments and the Board's adoption of them also excludes preferred embodiments of the invention. (*E.g.*, Appx95(2:51-54)("The FPGA *preferably* includes more than thirty thousand gates (30,000) and adds a freely re-configurable and separately programmable multi-purpose digital system which can run *independent of the microprocessor*."); Appx96(3:5-11)("*Preferably*, the present invention supports multiple analog inputs (to either 14 bit or 12 bit digitizers), with at least four analog inputs to a high precision (xx bit) digitizer analog outputs (from a digital representation), adjustable analog signal paths (variable gain, offset, impedance, signal filtration properties), serial communications ports, interrupts, and digital discrete I/O."); Appx96(4:39-49); Appx98(7:39-50); Appx98(8:35-36) ("*Preferably*, the FPGA can be configured in numerous gate array patterns"); Appx99(9:24-35).) But an interpretation where "a preferred … embodiment in the specification would not fall within the scope of the patent claim" "is rarely, if ever, correct" absent "highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

The specification's description of the FPGA being configured for *both analog processing and digital switching* provides context for the proper interpretation of "independent processes" and is contrary to the arguments and interpretation

16

presented by Xilinx in its Responsive Brief.  (Resp. Br. at 11-20, 33-42.)  That the described and claimed FPGA is designed to perform these distinct independent processes, among others, confirms Sentient's proposed construction that "process" is a "computational process programmed into the FPGA gates" and that "independent processes" are processes that occur "without computational assistance from another."  (Op. Br. at 21.)  Contrary to Xilinx's and the Board's positions, the term "computational" was proposed to best capture the specification's description of the various analog and digital inputs that may be independently processed by the FPGA—and independently from, yet parallel to, the processor as recited in the claims—to outputs that may then be utilized or further processed.  (Op. Br. at 29 (reciting Mr. Peck's definition of "computation" as "an operation that begins with some initial conditions and gives an output which follows from a definite set of rules.").)  That is what an "independent process" plainly means in the context of the specification.

Although criticized by both Xilinx and the Board (*see* Resp. Br. at 18 (citing Appx407-409), the intrinsic evidence buttresses Sentient's argument in the IPR sur-reply that "the claim term involving 'independent processes' must be interpreted within the context of the claimed 'instrument controller as a whole, which requires viewing the 'independent processes' on a system level instead of a sub-application level." (Appx407.)  To the contrary, Xilinx's microscopic focus on a single set of

17

sub-application gate arrays in Fig. 2 misses the boat.  Indeed, this system level interpretation of the specification provides the precedent for the various other limitations in the independent claims regarding the FPGA running independent processes in parallel with the processor, the plurality of analog-to-digital converters digitizing analog inputs at multiple bit depths, and the different portions of the FPGA gates configured to different tasks, including a portion of the gates "configured to operate as an internal embedded power converter capable of receiving an input voltage and generating each operating and reference voltage needed within he instrument controller" as recited in the claims.  (*E.g.*, Appx99(10:38-43).)

### 2.    Xilinx Misinterprets the Prosecution History.

Xilinx does not argue that there was any disavowal of claim scope during prosecution, or that some sort of argument-based or amendment-based estoppel applies.  Instead, through Dr. Shanfield's declaration, Xilinx speculates on the examiner's interpretation of the claims, and overreaches on how the examiner used the Cloutier reference.  (Resp. Br. at 36-37 (citing Appx764).)

The entire passage upon which Xilinx's argument relies is:

18

> Cloutier teaches a multiprocessor based on a multidimensional array of field programmable gate arrays (FPGAs) (column 2, lines 9-13, FIG. 1) adapted to function as a parallel processor (column 2, lines 65-67). In Cloutier, the multiprocessor provides improved data processing for applications requiring large number of operations (column 1, line 32-35). It would have been obvious to one of the ordinary skill in the art at the time of applicant's invention to use the FPGA-based processing elements, as suggested by Cloutier for the multi-chip module instrument controller disclosed by Lyke in order to run independent processes in parallel with the processor.

(Appx764.)  In this passage, the examiner provides no information on claim interpretation.  Nor does the examiner allege that Cloutier actually teaches an FPGA "coupled to the processor and configured to run independent processes in parallel with the processor" as claimed.  Instead, the examiner argues only that it would have allegedly been "obvious to one of the ordinary skill in the art" "to use the FPGA-based processing elements" "to run independent processes in parallel with the processor."[3]  (Appx764.)

In the same office action, the examiner indicated that there was allowable subject matter in a few dependent claims.  (Appx766.)  In response, applicant simply chose to accept that allowable subject matter.  (Appx750; *see also* Appx738-743 (canceling the original independent claims to add their limitations to the allowable

---

[3]    Moreover, if it was so clear, as Xilinx contends, that Cloutier taught the "independent processes" limitation, Xilinx could have used the reference in a ground in the IPR.  It did not do so.

dependent claims.) Because the allowable subject matter was taken, there was no reason to affirmatively rebut the examiner's interpretation of Cloutier, so no substantive arguments were made on what Cloutier does or does not teach. To the contrary, in response to the rejection the applicant pointed to the "independent processes" functionality when stating that "the present invention offers enhanced power management and functional flexibility:"

> The instrument controller of the present invention offers enhanced power management and functional flexibility, more specifically, the instrument controller offers variable analog-to-digital conversion bit depths, along with higher bit depths for some applications. Also, the present invention eliminates the need for a resistive ASIC. Instead, the present invention adds a separately controllable FPGA that acts as a parallel processor with an internal clock or separate external clock. The FPGA preferably includes more than thirty thousand gates and adds a freely reconfigurable, and separately programmable, multi-purpose digital system that can run independent of the microprocessor. Also, the present invention incorporates a microprocessor with a processing speed of up to 33 MHz.

(Appx749.) Thus, if anything, the prosecution history is consistent with Sentient's position as set forth above and in its Opening Brief, including the "numerous gate array patterns" that act as "multiple processors formed in the FPGA for parallel processing," along with the goals of "managing multiple sensors" and processing "multiple analog signals simultaneously." (Appx98(7:64-66), Appx98(8:35-36), Appx99(9:18-23); *see also* Appx749 ("Preferably, the present invention supports the following: multiple analog inputs, with at least four analog inputs to a high precision digitizer, analog outputs, adjustable analog signal paths, serial communications

ports, interrupts, and digital discrete I/O.").)  The file history in no way supports changing the word "independent" from its ordinary meaning to "separate."

### 3.    Lyke Does Not Anticipate the Challenged Claims, and Xilinx Never Argued that it Does.

Xilinx never argued that Lyke anticipates one or more claims of the '177 patent.  *See Netflix, Inc. v. DivX, LLC*, 84 F.4th 1371, 1380-81 (Fed. Cir. 2023) quoting *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) ("The need to determine obviousness presumes anticipation is lacking").  In its Responsive Brief, however, Xilinx seems to argue that Lyke teaches every claim element because Lyke mentions an FPGA.  (Resp. Br. at 7-8.)  More specifically, Xilinx baldly states that "Lyke's FPGA runs 'independent processes'" via another conclusory "i.e." statement and testimony from Dr. Shanfield.  (Resp. Br. at 8.)  Xilinx then attempts to support its argument with more speculation by suggesting that the examiner would have rejected the allowed claims of the '177 patent over Lyke alone but "the presence of the FPGA with the processor in the Lyke reference seems to have gone unnoticed" by the examiner.  (Resp. Br. at 8.)  This speculative argument was also accepted and repeated by the Board.  (Appx46-48.)

Xilinx's argument is contrary to undisputed evidence.  Lyke was discussed in the specification, was at the forefront of prosecution and used as a primary reference, and the examiner explicitly crafted search strings seeking references disclosing FPGAs.  (Op. Br. at 9-14.)

21

In any event, the argument that Lyke anticipates was never made below in the IPR grounds. *Netflix, Inc.*, 84 F.4th at 1377 ("[W]e have rejected, many times, post-hoc attempts on appeal to include additional, new arguments not contained in the petition."); *see also Apple Inc. v. MPH Techs. Oy*, No. 2021-1355, 2022 WL 4103286, at *8 (Fed. Cir. Sept. 8, 2022) (affirming the Board's finding of nonobviousness of dependent claims because petitioner's ground against those claims did not include a reference used in the ground against the independent claim).

### C.    Neither Lyke Nor Dehkordi Teach "Independent Processes."

The only references that Xilinx cites for the "independent processes" limitation—Lyke and Dehkordi—fail to disclose that limitation when "independent" is given its plain meaning. (Op. Br. at 33-39.) Xilinx's arguments to the contrary shoehorn that limitation into those reference simply by repeating its own broadening construction of "independent" as "separate." (Resp. Br. at 9 (describing certain processes as "separate" or run "separately").) But, aside from its extrinsic evidence-driven claim construction, Xilinx does not explain how each "separately" run process is "independent" of and "parallel" with other processes run in the FPGA and the processor. (Resp. Br. at 9.) Because the Board's claim construction of "independent processes" should be reversed, its decision rendering claims 1-5, 10-15, and 17-20 obvious should also be reversed.

Additionally, and as discussed above, Fig. 2 refers to an example of "FPGA Gates as Switches" and "FPGA Gates as Analog Processes:"



*Fig. 2*

(Appx93.) This is another differentiator and improvement over Lyke, which implements similar switches in micro-electromechanical systems (MEMS) technology. (Appx603(Fig. 6), Appx611(2:43-44.), Appx613(5:39-42).) The specification of the '177 patent states that the "parallel processing internal to the FPGA eliminates the unreliability of switches built from discrete or [MEMS] technology," and the "FPGA switching is far superior to prewired solid state switches for near-static reconfiguration of digital ***and*** analog signal lines." (Appx98(8:33-44).)

Notably, this concept of processing digital ***and*** analog signals via the FPGA is completely absent from Lyke and Dehkordi. In fact, Dehkordi fails to mention either "independent" or "analog" anywhere. Lyke mentions "analog" only in the context of an "analog application-specific integrated circuit (ASIC) and MEMS

technology.   (Appx612(3:4-8), Appx612(4:58-5:5)(describing that ASIC as "implement[ing] many of the key instrumentation functions" and noting that "[t]he use of a separate integrated circuit for analog functions is important as it permits better electrical isolation" and "better control of the analog system electrical environment."), Appx613(5:39-42)(noting the "analog agility is implemented" using MEMS "[f]or great precision and lower noise"), Appx613(6:30-62).)

Accordingly, the Board's obviousness determination should be reversed because the cited art fails to teach or suggest the "independent processes" limitation of the claims.

### D.   Power Converter

#### 1.   Xilinx's Combined System of Lyke and Steele Fails to Establish the Contested "Power Converter"

In its Responsive Brief, Xilinx repeatedly argues that it "provided multiple paths to establish the contested 'power converter'" claim limitation.  (Resp. Br. at 26.)  But the grounds in Xilinx's petition provided only a *single pathway* based on the combination of two main references: Lyke for its "internal embedded power converter" and Steele for its "teachings to embed such a power converter." (Appx161.)  Xilinx's insistence that Sentient failed to address the argument that "Lyke provided the required 'power converter'" (Resp. Br. at 28) is little more than a distraction, as Xilinx admits it needs Steele to teach the placement of *such a power converter* within the FPGA gates for its combination to work.  (Appx161 (Xilinx

24

discussing Steele's alleged "teaching of using part of an FPGA for power conversion"); *see also* Appx163-164 (Xilinx arguing how Steele "performs [the] role" of power conversion); Appx383-385 (Xilinx arguing that Steele provides the "power converter" limitation and motivation to combine).) Simply put, Xilinx did not argue and cannot argue that Lyke teaches an embedded power convert within an FPGA because that it not disclosed in Lyke, and any argument to that effect that Xilinx now seeks to make on appeal is waived. *Netflix, Inc., LLC*, 84 F.4th at 1377 ("[W]e have rejected, many times, post-hoc attempts on appeal to include additional, new arguments not contained in the petition.").

Regardless of Lyke's disclosure, Xilinx's combination fails if Steele does not teach such a power converter to bridge the two references. In fact, Xilinx concedes that Lyke's power converter is "not in an FPGA" as required by the claims. (*E.g.*, Appx99(10:38-43)("a third portion of the gates in the [FPGA] is configured to operate as an internal embedded power converter…."); Resp. Br. at 58 (acknowledging that Lyke's "power converter" is "not in an FPGA," requiring the motivation from Steele to do so).) As Sentient made clear in its Opening Brief in this Court (Op. Br. at 40-44) and underlying briefs before the PTAB (Appx228-232; Appx344-348), Steele cannot motivate embedding a power converter in an FPGA because it does not teach actual power conversion. (Op. Br. at 42-44.) More specifically, as argued in the Opening Brief, the equation for electrical power is

POWER (P) = CURRENT (I) X VOLTAGE (V).  (Op. Br. at 42.)  There are thus two variables that may change the Power (P) value.  Neither Xilinx nor Sentient has ever alleged Current (I) is altered.  Rather, the claim language itself requires the power converter that is "capable of receiving *an input voltage* and generating *each* operating *and* reference voltage needed within the instrument controller." (*E.g.*, Appx99(10:38-43).)

For this reason, Xilinx's reliance on *SmithKline Beecham Corp.* is misplaced. (Resp. Br. at 58 (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006)).)  Xilinx for the first time *now* describes its two proposed paths to establish the power converter claim limitation as: (a) "the teachings of Lyke's power converter placed into an FPGA as taught by Steele," and (b) "the power converter through the teachings of Steele's FPGA-based power converter with Lyke." (*See* Resp. Br. at 57-58.)  This articulation of separate pathways for combining Lyke and Steele appears nowhere in Xilinx's petition, nor in any of its preceding briefs and has been waived.  (*See* Appx161; Appx163-164; Appx383-385.)  Instead, Xilinx's petition describes a single pathway whereby a POSA, starting with Lyke's reference to a power converter, "would have sought out Steele's teachings to embed such a power converter in the FPGA." (Appx161.)  Sentient therefore did not fail to "address this basis for invalidity" as Xilinx alleges, referring to pathway "(a)".  (Resp. Br. at 58.)  Rather, Sentient highlighted the factual

deficiencies in Xilinx's single prior art combination, as presented in its petition (and the Board's decision), by focusing on the shortcomings of Steele. *Netflix, Inc.*, 84 F.4th at 1377-78 ("[W]e have rejected, many times, post-hoc attempts on appeal to include additional, new arguments not contained in the petition" and "[a]ny argument not raised to the Board is forfeited, and we decline to consider it for the first time on appeal.")

To be clear, the programmable logic device of Steele is not capable of changing one voltage to another voltage. (Op. Br. at 42-44.) While Steele contemplates various input and output voltages, the input and output voltages are always matched. (*Id.*) That is not power ***conversion.*** (*Id.*) Xilinx's chosen excerpts from Steele convey as much. (Resp. Br. at 27.) Whether an output in Steele's programmable logic device can be "derived from" an input (Appx701(2:40-43)), "generated by" an input (Appx702(4:41-42)), or allows for the "ability to choose the voltage level" (Appx701(2:40-43)) does not change the fact that the selected output will always equal its input, which is clearly not power ***conversion***. Notably, Xilinx ignores the excerpts from Steele that make this even more clear. (Op. Br. at 43 (citing Appx702(4:29-43).)

Finally, Xilinx takes issue with Sentient's reference to the basic equation for electrical power, POWER (P) = CURRENT (I) X VOLTAGE (V), as support for the power converter's inherent capability to change voltage. Xilinx apparently insists that Mr.

27

Peck opine on this basic law of physics for it to hold true in the context of the '177 patent's disclosure. (Resp. Br. at 55.) But an expert need not opine on a basic or universal law of physics or science for it to support the merits of an argument. *See, e.g.*, Fed. R. Evid. 201(b)(2); *Rothe Dev. Corp. v. Dep't of Def.*, 545 F.3d 1023, 1045–46 (Fed. Cir. 2008) (taking judicial notice of facts derived from official publications of the United States Geological Survey and the United States Census Bureau).

Moreover, that the '177 patent "is not described as needing to change voltage level" does not, as Xilinx purports, "show that the premise is untrue." (Resp. Br. at 55.) Ohm's Law governs electrical power and its relationship to voltage whether or not it is expressly described. *See, e.g.*, Fed. R. Evid. 201(b)(2). In any case, this concept was argued below in Sentient's Sur-Reply. (Appx413-414.) At bottom, Xilinx cannot dispute a basic scientific law.

Therefore, the Court should reverse the Board's invalidity conclusions, which rest on an erroneous finding that Steele teaches the "power converter" limitation.

## III.    RELIEF SOUGHT

Sentient respectfully requests that this Court reverse the Final Written Decision (Appx1-81) invalidating the challenged claims issued by the Board.

Dated: May 23, 2025                    /s/   Andrew J. Cochran

Andrew J. Cochran
Gerald J. Flattmann, Jr.
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
*acochran@cahill.com*
*gflattmann@cahill.com*

29

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

This principal brief complies with the word length limits permitted by Federal Circuit Rule 32(b)(1) as it contains 6092 words. This brief also complies with the type size and typeface requirements under Federal Rule of Appellate Procedure 32(g), because it has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: May 23, 2025

/s/   Andrew J. Cochran

Andrew J. Cochran
Gerald J. Flattmann, Jr.
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
*acochran@cahill.com*
*gflattmann@cahill.com*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 23, 2025, I served a copy of the foregoing on counsel

of record by Electronic Means (by E-mail and CM/ECF).

FISH & RICHARDSON P.C.                                    VIA ELECTRONIC MAIL
David M. Hoffman, Reg. No. 54,174
Jeffrey A. Shneidman (Pro Hac Vice)
Craig A. Deutsch, Reg. No. 69,264
John A. Dragseth
Kenneth Darby
hoffman@fr.com
shneidman@fr.com
deutsch@fr.com
dragseth@fr.com
kdarby@fr.com

Dated:  May 23, 2025                    /s/   Andrew J. Cochran

                                        Andrew J. Cochran
                                        Gerald J. Flattmann, Jr.
                                        CAHILL GORDON & REINDEL LLP
                                        32 Old Slip
                                        New York, NY 10005
                                        *acochran@cahill.com*
                                        *gflattmann@cahill.com*